FILED
FEB 5 2007
U.S. DISTRICT COURT
CLARKSBURG, WV 26301

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA

IN THE MATTER OF
THE EXTRADITION OF             Misc. No. 1:06mc40
RAELIN SHAWN COLEMAN

## MEMORANDUM OPINION AND ORDER

The United States of America ("the United States"), acting for and on behalf of the Government of Canada ("Canada"), seeks a certification that Raelin Shawn Coleman ("Coleman") is extraditable to Canada. The United States is proceeding under the Treaty on Extradition between the United States of America and Canada, signed at Washington, D.C. December 3, 1971, and entered into force on March 22, 1976 (TIAS 8237); the Agreement amending the treaty effected by exchange of notes signed at Washington, D.C. June 28 and July 9, 1974; the Protocol amending the treaty signed at Ottawa on January 11, 1988, which entered into force on November 26, 1991; and the Second Protocol amending the treaty signed at Ottawa on January 12, 2001, which entered into force on April 30, 2003 ("The Treaty"), and 18 U.S.C. §3184 ("the Statute").[1]

---

[1] § 3184 provides, in pertinent part:

Whenever there is a treaty or convention for extradition between the United States and any foreign government . . . any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States . . . may upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, or provided for under section 3181(b), issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate judge, to the end that the evidence of criminality may be heard and considered . . . . If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or under section 3181(b), he shall certify the same, together with a copy of all the testimony taken before him to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue the warrant for the commitment of the person

Pursuant to the Treaty, Canada has submitted a formal request through diplomatic channels for the extradition of Coleman. The U.S. Department of Justice received a copy of Diplomatic Note No. 0343, dated November 24, 2006, by which the request for extradition was made. The documents in support of extradition are properly certified and authenticated by Keith Powell, II, the Consul General of the United States of America at Ottawa, so as to entitle them to be received in evidence in accordance with Article 10 of the Treaty and Title 18, United States Code Section 3190.[2]

The United States filed its Complaint under oath on December 20, 2006, charging Coleman with having committed within Canada crimes provided for by the Treaty. The undersigned United States Magistrate Judge issued his warrant for Coleman's apprehension on December 20, 2006, that he may be brought before the Court to the end that the evidence of criminality may be heard and considered.

Coleman filed his "Motion to Deny Certification for Extradition" on January 17, 2007 (Docket Entry 7). The United States filed its "Response to Relator's Motion to Deny Certification of Extradition" on January 29, 2007 (Docket entry 10).

In an extradition proceeding pursuant to 18 U.S.C. § 3184, this Court must determine: 1)

---

so charged to the proper jail, there to remain until such surrender shall be made.

[2]§3190 provides, in pertinent part:

Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.

whether the United States and Canada are parties to a valid extradition treaty; 2) whether the accused is in fact the person who has been charged by the requesting state; 3) whether the arrest warrant from Canada is outstanding; 4) whether the offenses of which Coleman is charged are extraditable under the Treaty; and 5) whether there is probable cause to believe the accused committed the crime. Matter of Extradition of Lui, 939 F.Supp. 934 (D. Mass. 1996).

On January 30, 2007, the Court commenced the hearing required by 18 U.S.C. §3184. Coleman appeared in person and by his appointed counsel, Brian J. Kornbrath. The United States appeared by its Assistant United States Attorney David E. Godwin.

For reasons stated below, the undersigned United States Magistrate Judge finds the United States has met its burden of showing that Coleman is subject to extradition.

**Facts**

The following facts are recited verbatim from the parties' stipulation of facts from Coleman's plea agreement in the Eastern District of Michigan, and are not in dispute for purposes of the Motion at bar.

> On August 22, 2005, Raelin Coleman was in a dispute with an individual known to law enforcement at his residence in Windsor, Ontario, Canada. COLEMAN, along with two females . . . left the victim's residence and entered the United States by means of the Detroit-Windsor tunnel at approximately 0052 hours on August 23, 2005. COLEMAN drove to his residence in Southfield, Michigan and retrieved a a [sic] Remington Model 870 12 gauge shotgun, serial number D268497A. COLEMAN placed the shotgun in his vehicle, and returned to the victim's residence in Canada.
>
> On August 23, 2005, at approximately 0220 hours, COLEMAN arrived at the victim's residence in Windsor, Ontario, Canada, where COLEMAN, as well as the two females exited the vehicle. An argument again ensued. COLEMAN retrieved the previously identified Remington 870 shotgun from his vehicle. COLEMAN then fired one shot at the victim from close range, striking him in the upper left thigh area. COLEMAN returned to the identified vehicle, along with the two females and

3

departed.

COLEMAN discarded the identified Remington 870 shotgun into the Detroit River. At approximately 0246 hours, COLEMAN re-entered the United States via the Ambassador Bridge, in Detroit, Michigan.

On September 7, 2005, Coleman was Indicted in the Eastern District of Michigan in a one-count Indictment charging him with "Transportation of a Firearm in Interstate and Foreign Commerce with Intention to Commit a Crime," in violation of 18 U.S.C. §924(b). On January 27, 2006, Coleman entered a plea of guilty to Count I (the only count) of the Indictment.

A Presentence Investigation Report ("PSR") was submitted on March 3, 2006. The offense conduct contained in the PSR is the same as that contained in the parties' stipulation in the plea agreement. Coleman also submitted his "Version of the Offense," stating:

> On August 23, 2005, Mr. Coleman traveled from his residence in Michigan with his Remington .12 gauge shotgun to Windsor, Ontario, Canada with the intent to commit an offense which carries more than one year.
>
> Mr. Coleman was arrested in the United States on approximately September 2, 2005. He pled guilty to the Indictment on January 27, 2006. He is sincerely sorry for this offense.

Pursuant to the 2005 edition of the Guidelines Manual, the Pretrial Services Officer computed Coleman's Offense Level for the charged offense of "Transportation of a Firearm in Interstate and Foreign Commerce with Intent to Commit a Crime." The base level offense for the violation was listed as 12. Under "Specific Offense Characteristics," the Pretrial Services Officer recommended:

> As the defendant possessed and transported the firearm with intent to commit another felony offense, pursuant to §2K2.1(b)(5),[3] four levels are added. However, as the

---

[3] 2K2.1 applies to "Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition; Prohibited Transactions Involving Firearms or Ammunition." in 2005, (b)(5) provided:

4

offense level is less than 18, it is increased to 18.[4]

Under Pending Charges, the Pretrial Services Officer noted:

> The defendant is pending a charge of Attempted Murder in the Provincial Court, Windsor, Ontario, Canada, under Case No. 05-4202-01.

Based on the total offense level of 15 and criminal history category of I, the guideline imprisonment range was 18-24 months. On April 27, 2006, Coleman was sentenced to 18 months in custody.

On August 26, 2005, Windsor police filed an Information and Arrest Warrant for Coleman, charging that:

> [O]n or about the 23rd day of August in the year 2005 at the City of Windsor in the said region [Coleman] did attempt to murder Tim FISHER by discharging a firearm, contrary to Section 239 of the Criminal Code of Canada . . . .
>
> [O]n or about the 23rd day of August in the year 2005 at the City of Windsor in the said region [Coleman] did, with intent to endanger the life of Tim FISHER, discharge a firearm, namely a shotgun at Tim FISHER, contrary to Section 244, clause (b) of the Criminal Code of Canada . . . .
>
> [O]n or about the 23rd day of August in the year 2005 at the City of Windsor in the said region [Coleman] did possess a weapon, namely a shotgun, for the purpose of committing an offense, contrary to Section 88, subsection (1) of the Criminal Code of Canada . . . .
>
> [O]n or about the 23rd day of August in the year 2005 at the City of Windsor, in the said region [Coleman] did, without lawful excuse, point a firearm, namely a shotgun at another person, namely Tim FISHER, contrary to Section 87, subsection (2) of the Criminal Code of Canada.

---

If the defendant used or posses any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense, increase by 4 levels. If the resulting offense level is less than level 18, increase to level 18.

[4]Coleman received a three level deduction for acceptance of responsibility, for a total offense level of 15.

5

## Discussion

Neither party disputes that the United States and Canada are parties to a valid extradition treaty and the Court finds there is such a valid extradition treaty. Neither party disputes that there is an outstanding warrant from Canada, and the Court so finds. Neither party disputes that Coleman was found within the jurisdiction of this Court. Coleman was in the custody of the Bureau of Prisons at FCI Gilmer in or near Glenville, in Gilmer County, West Virginia, within the Northern District of West Virginia, by order of the United States District Court for the Eastern District of Michigan. He was expected to be released from custody on December 23, 2006. The Court therefore finds he was found within this Court's jurisdiction. Neither party disputes that Coleman is the individual named in the complaint or that there is probable cause to believe he committed the crime alleged in the complaint, and the Court so finds. There is finally no dispute that the offenses charged in Canada are punishable under the laws of both countries by imprisonment for more than one year, and the Court so finds.

The sole issue before the Court is therefore whether the offenses with which Coleman is charged in Canada are extraditable under the Treaty. Coleman argues that they are not, based on Article 4 of the Treaty, which provides, in pertinent part:

(1) Extradition shall not be granted in any of the following circumstances:

> (i) When the person whose surrender is sought is being proceeded against or has been tried and discharged or punished in the territory of the requested State for the offense for which his extradition is requested.

Coleman argues: "Of critical importance to Coleman's claim is the 'parties stipula[tion] that the following facts are true' as contained on page 2 and 3 of the plea agreement;" and "Equally

6

important to Coleman's instant claim is the fact that his federal sentence was increased based on this same alleged misconduct." The stipulation of facts contained in the plea agreement does appear to recite most, if not all of the conduct that makes up the criminal charges in Canada. Coleman argues that his extradition is barred by the "double jeopardy" clause of the extradition treaty.

The Court first notes that the Fifth Amendment's protection against double jeopardy extends only to successive prosecutions brought by the same sovereign. See Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); United States v. Lanza, 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314(1922); Moore v. Illinois, 55 U.S. 13, 14 L.Ed. 306 (1852). The Double Jeopardy Clause of the Fifth Amendment therefore does not itself bar Coleman's extradition following his prosecution in the United States even if the offenses charged were the same.

The Treaty between the United States and Canada does, however, bar Coleman's extradition if he "has been tried and discharged or punished in [the United States] for the offense for which his extradition is requested." This prohibition is contained in most United States extradition treaties.

The Court frames the question as whether the United States prosecution for "Transportation of a Firearm in Interstate and Foreign Commerce with Intention to Commit a Crime," in violation of 18 U.S.C. §924(b), and the Canadian charges of attempted murder by discharging of a firearm; discharge of a firearm with intent to endanger life; possession of a weapon, namely a shotgun, for the purpose of committing an offense; and pointing a firearm at another person constitute sequential prosecutions for the same "offense" within the meany of Article 4 of the Treaty.

Interpretation of an international treaty begins with the language itself unless it effects a result inconsistent with the parties' intentions. See Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982). A treaty is essentially a contract between two nations,

and therefore interpretation starts with the text of the treaty and the context in which the written words are used. <u>Societe Nationale Industrielle Aeropastiale v. United States District Court for the Southern District of Iowa</u>, 482 U.S. 522, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987).

The Court finds instructive the following from <u>Factor v. Laubenheimer</u>, 290 U.S. 276, 54 S.Ct. 191, 78 L.Ed. 315 (1933), even though the issue in that extradition differed from that at bar:

> The obligation to do what some nations have done voluntarily in the interest of justice and friendly international relations . . . .should be construed more liberally than a criminal statute or the technical requirements of criminal procedure.

Coleman relies on <u>Sindona v. Grant</u>, 619 F.2d 167 (2nd Cir. 1980) and <u>Ashe v. Swenson</u>, 397 U.S. 436 (1970) to support his argument. The so-called "double jeopardy" clause in <u>Sindona</u> is nearly identical to that used in the case at bar. The sole difference is the use of the term requested "Party" in <u>Sindona</u> and requested "State" here. In <u>Sindona</u>, the Government, relying on <u>Blockburger v. United States</u>, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), urged that the test of whether an "offense" is the same "is whether each provision requires proof of an additional fact which the other does not." Clearly, under the <u>Blockburger</u> test, the offense charged in this case in the United States would be entirely different from the offenses charged in Canada. The court in <u>Sindona</u>, however, rejected the <u>Blockburger</u> test and instead approved "a modified and more flexible test of whether the same conduct or transaction underlies the criminal charges in both transactions." <u>Id.</u> at 178, citing <u>Ashe v. Swenson</u>, <u>supra</u> (concurring opinion).

Even relying on a test "at least as broad as that expressed in Mr. Justice Brennan's concurring opinion in <u>Ashe v. Swenson</u>, <u>supra</u>, or in the Petite policy," the court in <u>Sindona</u> did not accept the defendant's conclusion that the offenses were the same and therefore not extraditable," stating:

> Broadly speaking, the Italian prosecutor charged a gigantic fraud perpetrated on the

8

Italian banks which generated funds that permitted Sindona to engage in allegedly criminal activities in Italy and other countries including the United States. The concern of the Republic of Italy is the harm done to depositors in the Italian banks; that of the United States is the damage to American depositors and investors. The crimes charged in the American indictment, while serious, are on the periphery of the circle of crime charged by the Italian prosecutors. Although the alleged Italian crime may have been the "but-for" cause of the alleged American offenses in providing Sindona with the wherewithal, it is not the crime for which the United States is proceeding against him. Indeed, principles of territorial jurisdiction make it extremely doubtful that this country could proceed against Sindona for the overwhelming bulk of the matters being charged in Italy or that Italy could prosecute him for most of the charges in the American indictment. Article VI(1) of the Treaty could not have been intended to have the consequence that substantial elements of crime should be left unpunishable. We thus reject Sindona's argument that Article VI(1) confers immunity from extradition.

Similarly, the United States charged Coleman with "Transportation of a Firearm in Interstate and Foreign Commerce with Intention to Commit a Crime." The elements of that offense, as stated in the plea bargain agreement are: (1) Defendant transported a firearm in interstate and foreign commerce; and (2) The defendant did so with the intent to commit an offense punishable by a term of imprisonment exceeding one year. The Canadian authorities have charged Coleman with attempted murder, discharge of a firearm with intent to endanger life, possession of a weapon for the purpose of committing an offense, and pointing a firearm at another person. Although "but for" Coleman's transportation of the firearm with intention to commit "a [felony] offense," the crimes charged in Canada may have never occurred, the offenses charged in Canada are clearly not the same as the one offense for which the United States prosecuted him. "Indeed, principles of territorial jurisdiction make it extremely doubtful that this country could proceed against [Coleman] for the bulk of the matters being charged in [Canada] or that [Canada] could prosecute him for most of the charges in the American Indictment. Article [IV(1)] of the Treaty could not have been intended to have the consequence that substantial elements of the crime [the most egregious example of which

being attempted murder] should be left unpunishable." Id.

The Court finds the offenses for which Canada seeks to extradite Coleman are not the same offenses for which he was already prosecuted in the United States, even if considered under the broader Sindona test.

Coleman also argues, however, that his federal sentence was increased based on the same misconduct as alleged in the plea agreement and pre-sentence report, and that he therefore was previously "punished" for this same misconduct. The Court disagrees.

The Second Circuit addressed a similar issue in Stowe v. Devoy, 588 F.2d 336 (2nd Cir. 1978). Stowe also involved an extradition treaty between Canada and the United States. The Court acknowledges that Stowe is distinguishable from the case at bar, in that Stowe was arrested and charged in Canada with conspiracy to import and importation of 5 ½ pounds of hashish into Canada and was subsequently indicted by the State of New York for felonious possession and sale of 100 pounds of hashish, an offense alleged to have occurred while he was on bail pending trial on the Canadian charges. The charges in Canada and New York were undisputedly based on totally separate and distinguishable acts. In fact, the court stated:

> There was no suggestion in the [New York] proceedings that the crime (or the hashish) which was the subject of the New York State prosecution was in any way related to or a part of the crimes (or the hashish) which were the basis of the charges pending against Stowe in Canada.

In March 1977, Stowe, pursuant to a plea bargain, pleaded guilty in New York to criminal possession of a controlled substance. In December 1977, Stowe was sentenced on that plea to a fine of $1,000, without imposition of a jail sentence or any period of probation. In October 1977, a warrant was issued for Stowe's arrest upon complaint alleging that the Canadian government had

requested Stowe's extradition under the Treaty. At the request of Stowe's counsel, the sentencing judge in the New York case sent a letter to the United States Magistrate who would hear the extradition matter, in which he stated:

> While those charges in Canada were not before me, I did consider those charges as part of the plea bargain arrangement and the sentence that was imposed. (Defense counsel) submitted to me a copy of the minutes of the sentencing of Roger Stowe before me on December 15, 1977, and has asked me to comment on an interpretation he represented to me of those minutes given by an assistant United States Attorney, to the effect that the sentence that I imposed was lenient because I was under the impression that he would be punished additionally by Canadian authorities. This was not the case. My sentence was imposed because of the view with which the courts and in particular, myself, have come to view marijuana offenses and because of the particular background of the defendant before me, his role in the crimes charged, and my knowledge and consideration of the charges against the defendant pending in Canada.

The Second Circuit found the primary issue in the case was whether Article 4(1)(i) barred Stowe's extradition, holding that the offense for which Stowe alleged he had been "tried and discharged or punished" as part of his plea bargain was not the same "offense for which extradition [was] requested." The Second Circuit then stated:

> As we have noted, the protection of Article 4(1)(i) extends only to those persons who have been previously "tried and discharged or punished" for the extraditing offense. Defendant argues that the Article sets forth two alternative requirements; and that extradition is barred if the fugitive has been either "tried and discharged" or if he had been "punished". Thus, he claims that the Treaty elevated the concept of prior punishment to a level of great importance. However, as probation reports customarily list all of defendant's past indiscretions, there would almost always be a factual basis for a contention that the defendant had been "punished" for the extraditable offense. To read the provision so broadly does violence not only to its language but to the reason and intent of the Treaty by giving any court the power to subvert the extradition agreement. The Article does not apply unless two distinct requirements are satisfied: (1) the fugitive must have been "tried" for the offense in question, and (2) the trial must have resulted in discharge or punishment. In other words, "discharged" and "punished" are corollaries, each of which modifies "tried".

> This interpretation is consistent with the purpose of Article 4(1)(i). The "double

11

jeopardy provision of extradition treaties is intended to "prevent extradition of Americans actually in the process of trial or who have been tried". Statement by Mrs. Hauser before the Special Subcommittee on the Genocide Convention of the Senate Committee on Foreign Relations (April 24, 1970). Reprinted in 63 Dep't State Bull. 9 (July 9, 1970).

Applying these considerations to the instant case, the state judge's "consideration" of charges not before the court did not fulfill the necessary requirements for barring extradition under the Article. To activate that provision the charges upon which a fugitive has been "punished" in the United States not only must cover the same acts as those which are the subject of the extradition request but must also have been the subject of formal charges (upon which the defendant was "tried") before "the punishing" court.

This Court also notes with approval a 2000 case from the Eastern District of New York, Elcock v. United States, 80 F.Supp.2d 70 (E.D.N.Y. 2000). In that case, the defendant, Elcock, together with a German accomplice, stole over $400,000 from a bank in Germany. The two concealed the money in a hollowed-out Teddy bear and three empty puzzle boxes and placed those into a single package, mailing all to Elcock's sister in the United States. Elcock himself then flew back to the United States and intercepted the package.

Elcock was arrested, indicted, and tried in the United States District Court for the Eastern District of New York on charges of transporting stolen currency in foreign commerce, receipt and possession of stolen currency, and smuggling stolen currency into the United States. He was found guilty of transporting stolen currency in foreign commerce and smuggling the currency into the United States. Id. at 73-74.

On July 2, 1998, Elcock was sentenced by the court. Elcock objected to the portions of the presentence investigative report which outlined his role in the theft from the German bank, but his objections were overruled in that the court found "there was sufficient evidence to conclude that Elcock had taken part in the theft." Id. "Moreover, because Elcock had engaged in a 'very clever

scheme' his sentence was enhanced by two levels for more than minimal planning." He received a sentence of thirty months in prison.

While Elcock was being prosecuted in the United States, extradition proceedings were commenced in the same court. After an extradition hearing on February 10, 1998, a United States Magistrate Judge issued a Certification and Order certifying the matter to the Secretary of State. Id. at 75.

Elcock filed a petition for a writ of habeas corpus blocking his extradition, arguing that because of his American prosecution, his extradition was barred by the prior jeopardy provision of the extradition treaty between the United States and Germany. Among other arguments, Elcock argued, as does Coleman here, that he had been punished for the bank robbery because the American court considered evidence of "relevant conduct" under the Sentencing Guidelines and, based on that evidence, made an upward departure for more than minimal planning. Id. at 86. The court noted:

> Under domestic law, it is well-settled that an enhancement based on evidence of relevant conduct does not constitute punishment for that conduct for double jeopardy purposes. See United States v. Watts, 519 U.S. 148, 177 S.Ct. 633, 136 L.Ed.2d 351 (1995). In the view of American court, Elcock's sentence was enhanced for more than minimal planning, not for the robbery; the robbery in Germany was considered only as evidence of the planning.
>
> Notwithstanding the domestic understanding of relevant conduct evidence, the question arises whether a sentencing enhancement is "punish[ment]" within the meaning of the Treaty. The Second Circuit decided this question in a case involving a nearly identical double jeopardy provision in the United States' extradition treaty with Canada. In Stowe v. Devoy, 588 F.2d 336 (2d Cir. 1978), the Second Circuit held that the fact that a New York court had considered pending Canadian narcotics charges in sentencing an extraditee for a domestic narcotics offense did not mean that the extraditee had been "punished" for the Canadian charges within the meaning of the treaty. . . . [T]he Canadian treaty provision applies only to individuals who have been "tried and discharged or punished." There having been no contention that he had been "Tried by the New York court for the Canadian charges, the extraditee in Stowe argues that the provision should be read disjunctively, i.e., as requiring only

13

that an individual have been either "tried and discharged" or "punished." ....Noting that probation reports customarily list all of a defendant's past indiscretions, the Second Circuit rejected this disjunctive reading on the grounds that 'does violence not only to [the provision's] language but to the reasons and intent of the [t]reaty by giving any court the power to subvert the extradition agreement." ... The Second Circuit therefore held that the language in question requires both that the defendant was "tried" for the offense in question, and that the trial resulted in discharge or punishment ....

The same argument applies with respect to [Elcock's claim]. Elcock makes no claim that he was "tried" in America for the bank robbery, nor can he on any plausible reading of the term. Thus, Elcock has not been "tried and .. punished" for the bank robbery as required for Article 8 to apply.

The Court finds significant that 2K2.1, applied to Coleman in the Eastern District of Michigan, concerns only the "Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition." There is no specific provision for any violent behavior or for any offense against a person whatsoever. The crime with which Coleman was charged in the United States was completed long before Coleman shot anyone. He possessed and transported the firearm with the intent to commit another crime. He was not charged in the United States with committing the actual "other crime." He was not tried for committing the "other crime." He was not punished for committing the "other crime." "Indeed, principles of territorial jurisdiction make it extremely doubtful that [the United States] could [have] proceed[ed] against [Coleman] for the overwhelming bulk of the matters being charged in [Canada] .... Sindona, supra. "Article [IV(1)] of the Treaty could not have been intended to have the consequence that substantial elements of crime should be left unpunishable." Id. The United States did not prosecute Coleman for attempted murder or any violent crime whatsoever, nor could it. To conclude that Coleman cannot be prosecuted in Canada for the violent offenses he allegedly committed there would leave those offenses "left unpunishable."

As the EDNY found in Elcock, this Court finds that Coleman was not tried and discharged

14

or tried and punished for the Canadian offenses charged.

## FINDINGS

For all the above reasons, the Court makes the following findings:

1.  The undersigned United States Magistrate Judge had jurisdiction to conduct the extradition proceeding;

2.  This Court had jurisdiction over Coleman;

3.  Coleman is the fugitive named in the request for extradition;

4.  There is an extradition treaty in full force and effect between the United States of America and Canada;

5.  The crimes for which Coleman's surrender is requested are covered by the Treaty;

6.  The crimes for which Coleman's surrender is requested are punishable under the laws of both countries by imprisonment for more than one year;

7.  The crimes for which Coleman's surrender is requested are not of a political nature within the meaning or any provision barring extradition for such crimes; and

8.  There is competent legal evidence to support the finding of probable cause as to each charge for which extradition is sought.

## CERTIFICATE OF EXTRADITABILITY

Accordingly, it is hereby **ADJUDGED, DECREED, AND ORDERED** as follows:

The United States District Court for the Northern District of West Virginia, by the undersigned United States Magistrate Judge, hereby certifies to the Secretary of State that:

(a) With respect to Raelin Shawn Coleman, a fugitive from Canada who was found in this judicial district, the United States Government, acting on behalf of the Government of Canada, has provided "evidence sufficient to sustain the charge[s] [against Coleman] under the provisions of the proper treaty or convention . . . ." as required by 18 U.S.C. §3184.

(b) The charges against Coleman are those set forth in the affidavits and sworn

Complaint upon which Coleman's arrest was made in this district.

(c) All applicable requirements of Chapter 209 of Title 18 of the United States Code for the extradition of Coleman to Canada have been met.

(d) The transcripts and copies of records from Canada that accompany this certification constitute "a copy of all the testimony taken" in this matter as provided for in 18 U.S.C. § 3184.

This Certificate of Extraditability, the separate Warrant For Commitment, together with all formal extradition documents received into evidence, together with a certified copy of all testimony and evidence taken at the hearing and all memoranda of law filed on the issue of extradition, and all orders of Court, shall be forwarded to the Secretary of State by the United States Attorney for the Northern District of West Virginia, so that a warrant may issue upon the requisition of the proper authorities of Canada for the surrender of Raelin Shawn Coleman, according to the provisions of the "Treaty" between the United States of America and Canada (TIAS 8237).

Defendant, Raelin Shawn Coleman, in accord with a separate Warrant For Commitment and in accord with the provisions hereof, shall be committed to the custody of the U.S. Marshal's Service of the United States of America pending his surrender to Canada, or until the further order of the court.

The Clerk of the Court is directed to send a copy of this Memorandum Opinion and Order to all counsel of record and appropriate agencies.

DATED: February 5, 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE